Good morning, your honors. May it please the court, Alan Durth with the appellants, and I will reserve five minutes for rebuttal. Does the Constitution impose any meaningful limit upon the legislature's ability to ban guns as a by-law? Stephen claims its power here is nearly plenary, arguing that, so long as it allows the position of a citizen to be amended, it can measure all the rest without even being able to say yes. And if any of those handguns in America, including all use of semi-automatic handguns since 2013, somehow indulge the citizens, Stephen argues that, so long as it has a reason to ban guns, the courts are obligated to defer not only to the legislature's assessment of what is best for society, but to the legislature's assessment of what is constitutional. The court, under this view, doesn't measure the fit between the state's goals and actions to see whether the state has gone too far. We disagree. First, let's make no mistake. The handgun roster law is a gun ban. It does not impose conditions or qualifications on the sale of arms. It delineates which arms can be acquired. It doesn't prevent a person from being armed. They just can't be armed with the gun they want. That's correct. And so, while we're affected, the people of Washington do see it in other instances. Or, on a similar, the handgun roster law functions, how similar it is to the laws that were struck down in Hungary. But Justice Scalia and the other have indicated there are restrictions. It's just, you don't get to pull it free. There are others. And here, it's on the basis of safety, as I understand it. That is, you can have a gun, but you can't have an unsafe gun. At least, you can't market it. So, that's been passed by the authorities. Doesn't that make your argument just a little different here? No, it doesn't. First of all, Your Honor, we don't question the fact that safe and the acquisition of firearms are unsafe in the sense that they don't operate safely in a manner that an enrolled person would expect to come to function. So, for example, we have no challenge in this case. We never did. We never challenged the requirement for drop testing. We never challenged anything relating to melting points. We never challenged anything relating to firing tests, all the things that relate to guns. Nor will we expect the operation of suits or product that are simply not an issue in this case. We're still challenging them. However, the point where Justice Scalia and Victoria Heller rejected was the approach advocated in Justice Breyer's suit. Justice Breyer offered a cogent, coherent, but ultimately rejected view of how to analyze handguns. He reasoned, as the State does here, that we have a balancing test to see whether or not the State has an interest for emitting arms. And we would then, before we then defer to the States, let's trace that aspect. Now, what the majority said, quite emphatically, is this is actually a categorical test. You know, first of all, that the Second Amendment extends fire-release to all arms, to all arms that are bearable arms. And the State should only ban those which are dangerous and neutral. As the Court also explained, the Second Amendment protects arms with the kind of product used. At the time, they were used by people for just so-called lawful purposes. Let me just interject one other thing. If you go back and look at some of the dispute in Heller, it was that there was a handgun ban. And the notion that, well, you know, you can't have a handgun. You can have a long gun. The Court clearly rejected that kind of substitutions argument. But we don't really have that here, do we? Because there is not a ban. Do you agree there is not a ban on the sale of handguns in California? There is a ban on the sale of most handguns in America. Now, before I'm talking about California, is there a ban, is there an absolute ban on handguns? No, Your Honor. However, what we would say is there is a signature to the failure. There is, clearly, an absolute ban. First of all, the State granted reasons for that. It's a ban. All new semi-automatic models introduced since 2013, and you can pull that into my course. The State posits that there's an interest in having deposited parts, shell casings, crime scenes, and then be traced back. Under that theory, the State can ban all revolvers as well, because revolvers don't deposit any shell casings at all. And, of course, there are no microstamping guns in existence. And so— But the issue is that here you have testimony and your declarations are clear that there's some disagreement about the efficacy of microstamping. But, in general, microstamping does not affect the user's ability to fire the gun, does it? Microstamping is a functional concept. That is, the State requires that guns have a particular function, as do stamped shell casings. And there are no guns that perform this function in America, and therefore— Well, that's because the gun manufacturers have decided at this point they're not going to manufacture guns with those. So isn't your argument really that you see down the road that the number of available models, crawlers, et cetera, would be on a kind of a continuously shrinking continuum? Well, we don't see down the road it's happening now. For example, right now, as we stand here today, there are only 744 models in the database and those 307 are semi-automatics. But if we look at the numbers just last month, if you read out the spoilers and the duplicates, there was just a little bit of stuff that said, okay, 10 new models offered for sale today. So— So, anyway, you could buy a 10-gun model, you just can't buy necessarily the model you might want, correct? Well, sure. And if California told Ford Motor Company that it could only produce model Gs, if Ford Motor Company said, you know, it's not our interest to be doing the model G production anymore, then there would be no Fords in California. When we started this case, there were many thousands— Well, I mean, I don't want to use autos as a particularly good analogy because there's a really constitutional issue. But if you do use autos as an analogy, think of airbags. When airbags were introduced to automakers, they said, oh, no way. I mean, they would cost too much. It would cost more. It would cost me. So I don't want to do that. That has a lot of ring to what you're talking about with your clients. Although I don't know if it's a fair analogy, as I said, because of the absence of a constitutional issue. I'm not sure that the airbag analogy was holding your honor because— Well, maybe with the Model T in that regard. Well, the Model T—the Model T actually is a good analogy because what we have here is we have manufacturers that are forced to maintain a certain amount of facility for California-compliant handguns and the handguns are improvements that have been made over a long period of time for sources of charge, such as the manufacturing process. So it's either the same model. Any minor modification requires sufficiently free testing and it carries a bit. For testing, again, is we now suddenly don't have jibbling indicators, maximum disconnectors, and now micro-stamping. The people's right to keep their arms should not be held hostage to some dispute between the manufacturers whose status toward them is something that's feasible. People have the right to access arms of the kind in common use for traditional lawful purposes. That includes, as this Court recognized in FIOC, which dealt with the magazine, and the Court in FIOC recognized, that semi-automatic handguns are arms of the kind in common use. In fact, if you look at the ATF manufacturing reports that are issued, every year they issue a handgun of the kind. But in February, they just came out with the 2014 numbers. Eighty-three percent of the handguns manufactured in the United States are semi-automatics. Forty-seventeen percent are revolvers. So California says, we're going to ban the overwhelming majority of these things because we want them signed to certainty. That is a gun ban out in Heller. Again, while it compares to the law issue in Heller, and also in the law issue here, Heller did the same thing that DC did in Heller. California does here. They banned guns by banning their acquisition. There were exceptions for certain special people. In DC, there were exceptions for retired police officers. There were exceptions for private security companies. There were exceptions for non-residents who came into Washington, D.C., for recreational purposes with no firearms, even though that particular element now is on the books. And also, there was grandfathering of the handguns of people who had registered in the business. Prior to the implementation of the ban in 1976, Chicago followed largely the same framework. But even from those, cities had grandfathering in the United States. Nonetheless, the Supreme Court and, in fact, everybody in the case covered those cases the same. It's a good ban. You're banning most handguns. People can't go to fire them here without a ban. It wasn't handguns per se. I mean, that's the way it was written. And this doesn't ban handguns. People will go out and buy handguns. So if the state were to ban a category of both spray guns, one gun, let's suppose there's one gun, and the state for every separate or particular gun, we would say that the right to secure our sprays because there's a single gun, that the state wouldn't then have to go into whether it should be spray scrutiny or intermediate analysis. You would just say if there was a single gun, even for safety reasons, that you disagreed with, that would be a second amendment. Not that I disagreed with. If they were truly correct. That is, it's not what I agree with. I don't disagree with the NCC. I don't disagree. Are you in proper safety positions? Because the NCC tells us that you don't, just as a starter case on safety, California doesn't ban here. In the D.C. case in Dallar, there was no dispute at all that handguns as a category of options are associated with a lot of crime. They're associated with accidents. There are social costs to the fact that handguns exist in America, and we didn't dispute that. But the reason the court went with the common use test, which is blending, and nobody has to like it, but it's straightforward. The reason they went with the common use test is because they did not trust courts to gauge malicious intent over specific types of arms or categories of arms. And so the Supreme Court said we're well aware that there are social costs to this, but the bottom line is these items are immune to the consequences of protection. So you can't ban handguns. We can't ban handguns as a category, but then they go on to say in L.A. or something we referenced earlier that, of course, one of the conditions is laws proposing conditions and qualifications, and the court will say them. And that's really the heart of what we're arguing about here today, right? So it's a harder one to case to argue. Is there a case where you would dispute that this is a condition or a qualification on sale? Haymorth and Heller was a conditional qualification on the sale of handguns. It wasn't. If you are regulating whether someone goes for a background check, if there is a screening requirement, if there is a safety test, which California, for example, has a conditional qualification on the sale of handguns that tests people's knowledge of handgun safety, and it actually teaches people to disregard all the things that it mandates here for handguns. It says don't rely on mechanical indicators. See, every gun is loaded, which everybody, I think, agrees is a good common sense of safety habit. But here, it's not about where you buy the gun or conditions attached to purchasing guns. It's the fact that you can't take this particular gun at all unless it's forced you into a category of special people, which in these categories seems to keep on expanding. As we noted in our Rule 28 letter, now it's widows of law enforcement officers, independent. This is very far afield from a safe thought. This is essentially a desire to restrict what guns are available to people, because the state disagrees which people should have. So it's not that the state thinks guns should go to each other. But doesn't the Second Amendment include people rather than weapons? Sure, I've been talking about these weapons. These weapons don't have rights. It's the person's right. Now, if they ban one gun, one model of one gun, you would say that's a violation, because someone out there may want that one gun. If they ban one book, one movie, one literature, that's something you would want to have, there would not be an answer to say, go read something else versus another gun. The reality is that people have a right to keep their guns, and they do. That's very far as it's not the availability of some arms. That's the basic question as to whether or not you have an interest in keeping the principle of armistice. And so it can be an interest. Well, it's going to have to show that what they're doing is dangerous in any way. They have to have something other than, well, we just prefer that it functions differently, because in our imagination, we think that weapons would be something different. Okay, I understand your argument. Tell me how you'd phrase it so that it's going to apply 20 years from now, from whatever, and they're going to bring it up for handguns. How would you phrase it? I understand your one-book argument, but how would you phrase it such that they could actually make any type of an inroad other than safety? Is safety the only inroad that he can conceive that would be a violation, that would not be a violation of the profit? Well, I think that we can start with, of course, the opportunity to speak in spirit of the subject we're talking about, of course, whether the weapon has lethal, dangerous propensities, and whether the weapon is commonly possessed by law-abiding citizens for lawful purposes. That's a very advanced statement. First of all, lethal, dangerous propensities, that's a mean that can occur until somebody accepts a weapon is due. Rather, I think you need lethal propensities because it's dangerous and can be unusable. We, instead, as a function of it, would not anticipate at some point a defector getting too close to their hand. Okay. So you have no objection at all to the actually keeping these and having restrictions on unsafegunners? We have no objection to laws. Some of these laws have been challenged to do this. We have no objection to laws that actually try to count defective products. We also are not mitigating, for example, restrictions on other categories of arms that have a completely different function. We have explosives, bazookas, machine guns, and military weapons. That's not, in this case, what we're talking about. And crime is based on allotosis. The Second Amendment applies to dangerous interests and to dangerous crimes. And then the question is whether or not they're dangerous or useful. Whether they are or, I suppose, would be profoundly disastrous. Well, I'm not going to explain it. It's not the alternative. I just want you to know that. You have about three minutes left. I do. And that's why I was going to wrap up and reserve my slides. All right. Okay. And, well, I suppose to explain how we use testing, because we're obviously going to be talking about an end-to-end crisis, but we suppose that this function of the sport will use the sport. Semi-automatic handguns, toy only arms, applied to criminal use for lawful purposes. This law bans some of the most popular handguns in America. We have efforts on that. And there's really no way to justify that in respect to action on the grounds that that's not a good thing. Good morning, runners. I'll give each regional for the end of the meeting. Just right off the bat, to address a couple of things brought up by both regions. This idea that the unsafe handgun act is a handgun ban is misplaced. There's not a handgun. It's not a handgun ban. The record shows, at least the court found, that hundreds of thousands of handgun transactions occur in California annually. Since this case was filed, there have been evidences in the records showing that there have been more than a million handgun transactions in California. If you buy a Soviet gun through California, people possess handguns in California. There are at least hundreds of different makes and models of handguns on the rosters today. The numbers agree with Russell's number. I think last week, last night, I had a chance to look at if all of a sudden the state of California decided to ban a gun, it would be not a violation of the First Amendment, just because we have a time correction. California would perform more handguns. So here is why the book analogy fails. Books are not guns. When you're looking at the purpose of a firearm regulation, the citizen being morally and religiously unlawful at the end of the day is self-defense, whether or not you're able to defend yourself. When it comes to books, there's freedom of speech, freedom of expression, a much broader, right, what exactly she's interested in. That's why we have a First Amendment and we have a Second Amendment. But I'm not at all persuaded by the idea that just because there's other guns we can buy in California doesn't mean guns. So the question for me here is whether the restrictions that California has placed on these guns effectively bans the guns, and if so, then whether we have to get high schooled and whether California's got to think of reasons for doing so. And it seems to me that safety is probably a very, very good reason for banning them. So why don't you tell us why these are safe? First of all, why the restrictions that are in issue here are important. Just back up to address your point about whether there's alternative channels to acquire other firearms. That is relevant in the law of the circuit under Jackson versus, I can tell you, San Francisco and some other cases. So that is a relevant consideration. And in this case in particular, remarkably, perhaps the plaintiffs in this case have admitted that they already possess handguns that they're able to defend themselves with and that they're able to purchase still more handguns than are still allowed. I mean, our theory could be simply ban all lookers. Just because a club was available. Well, frankly, it would depend on the reason that you would ban a particular pod. But is it not if we just banned all lookers? Could we do that just because? But if we did ban clubs? Well, to answer that question, and this goes to your other question, I would sequence the framework that applies here in the Ninth Circuit. And, you know, I mean, ultimately, you have to start in step one of the applicable two-step inquiry that applies in the Ninth Circuit. And that is, does it burden the conduct of the defendant by the second amendment? And one of the very first things that you ask yourself in that inquiry is, does it fall within one of those examples? These are all full categories. They're category conditions and regulations. And if California said no one may sell a looker in California, would they get us to step one? If anything can be characterized as a conditioning qualification. Well, it could as a conditioning qualification. You're right. I want to be careful because counsel has said that, well, if we can call anything a conditioning qualification, why not just have off-seat firearms? Well, that's not a conditioning qualification. That's an outright prohibition. That's an elimination. That's an happening injunction. So if you have a cross-court elimination, it would not be a conditioning qualification. I don't think the answer to my question is easy, but I think it's probably yes. The answer to your question is probably yes. And getting past step one doesn't mean that the state loses. No, it's not. It just means somebody has to set up a higher burden. No, that's exactly right. If you get beyond step one, you're only presumptively lawful. And also, alternatively, in the circuit, at step one you also look at historical evidence, circumstances, and regulations. That's an alternative way to get or lose, in any later perspective, at step one. In step two, and there is a burden, the question is what level of scrutiny to apply. We know from hell or that rational basis, assuming we're in step two of the inquiry, we know from hell or that rational basis it's off the table. But in cases like Chauvet, Cassie versus Chauvet in this circuit, the language is an appropriate level of scrutiny. For the most part, in a lot of the second amendment cases that have come down in this case has applied any kind of intermediate scrutiny. Well, given the non-state intermediate scrutiny, you had indicated you pretty much agree with Payne's counsel's statement of this decline. And it's something like, since 2013, the number of these rostered handguns has declined by just under 50%, 43.5% employment. That's a pretty dramatic figure of guns in terms of what is removed from the market in terms of for sale. Why and how do you justify that? Because ultimately you don't have anybody manufacturing, for example, micro-stamped guns. At some point you're going to just slide right off that scale. I agree with counsel's characterization of the numbers as of I think last week when I looked. It was 744. I don't agree with their basic premise that the roster is eventually going to decline and turn it to zero. I think there's been some expression from the bench about part of the reason for that decline is the manufacturer's choice to participate in the market in California to the maximum ability that they might otherwise be if they wanted to comply with these regulations. And maybe you can tell me what the state's position is on the construct. It's been emphasized that the Second Amendment is an individual right. It doesn't relate to the gun manufacturer. And yet a lot of the briefing, including yours, talks about the gun manufacturer, the feasibility of the gun manufacturer in doing things. So how does the market availability of a class of firearms, in this case handguns, from a manufacturer, how does that interface with the individual's right to be able to choose to do what they want to defend themselves? If I understand the question, I think in Florida, for example, there was a categorical ban on an entire class of firearms, handguns, in both possession and possession in the home. And that's not the situation here at all. It's not a categorical ban on an entire class. It's a categorical ban on any guns not containing the types of security devices that you now want to be able to see or find. The micro-scanning, it's not your honor. The Office of the State's Handgun Act is focused on, in layman's terms, bringing new handguns to market. So for that reason, it doesn't impact the position. So if you were to own an off-roster handgun, right, but there's all sorts of things. You're going to get into a state of commerce before you can possess them. You're going to ban the sale of any gun that doesn't have three things. The micro-scanning, you know, you haven't seen a lot, right? A new handgun brought to market. If you own that gun, you and I can exchange. If you don't, you've got a firearm for exchange. And that's what it would get to, intermediate scrutiny. All of these things are well within the legislature's ability to regulate firearms in California. These are all choices that the legislature made, and that are entitled to a great amount of deference. And the reasonable, excuse me, the intermediate scrutiny and the analysis, you know, you have the important interest. I think everyone agrees that there's important interest at stake here in terms of public safety and reducing handgun violence and reducing crime. Looking at the tailoring portion of it, the authority in the circuit is pretty clear. And on this, I would refer to the Chauvin case, and also, most recently, in Corruda. There's a concurrence. Your Honor joined in. That was endorsed by the majority. And it goes through that, you know, at my own intermediate scrutiny, the state only needs a regulation that promotes substantial government interest that would be achieved less effective as a regulation. It does not need to be the least restrictive. It needs only to be reasonable, not perfect. That's just a repetition of my intermediate scrutiny. Let me just go through step one, which you conceded that the second amendment applies. I am, while I'm not conceding the second amendment applies here, I said that, you know, we might actually be on step one, but they're not authentic over the years. But, yeah, if we're at step two, buying the future from this point forward, no guns can be sold in California unless they have the ability to get sealed by micro-stamping. At some point, there will be an inventory that doesn't meet that vocationally. I mean, yes, there will be private transfers still. There will be private transfers. But there will be no sales of guns commercially available unless it's got there. There are guns on the roster that have magazine discommit mechanisms and chamber loading mechanisms. There are guns on the roster that have those features. Let me just answer your question on this idea that you can get another book. That seems to me just a little bit slippery of a difficulty. And what occurs to me is you can close down a relation because next door there's another church. But there's fundamental constitutional rights. So the idea that it's okay to limit guns because there's another gun you can get, he wants people out here, but he took another constitutional right. We hold a few such people. We limit this church and ban it because you go to another church next door. Is that really the way we want to authorize this case? No. My response in terms of books that are not guns, that's in response to the analogy drawn by opposing counsel.  I'm asking you to clamp down on that part. The key to that answer, I think, is what's the purpose of the second epithet, which is self-defense. Specifically, the ability to possess a handgun in the best parts at home, which is a similar question. So when you're looking at regulations, that's the ultimate interest that's always lurking in the background. When it comes to books, it's a much broader interest. Yes, that's right. When it comes to religion, it's a much broader interest. I'm getting very specific. If you open a whole bunch of books, but you really believe in one religion, it isn't satisfactory to go to another church. And that's a constitutional right that you can choose your religion. Right. There's freedom of religion. A freedom of religion that gives us freedom of choice in religion. There's not freedom of choice when it comes to firearms. There's no constitutional right. Why isn't there a right in the individual, not in the weapon itself? Isn't it the individual's right under the Second Amendment? There's no gun right. There's a right of a weapon. I agree with the sentiment that the Second Amendment particularly applies to people who love guns. Yeah. But even when you do this, this is supposed to be a safety process. We've argued safety. But there's nothing about this stamping that's supposed to be safety. That goes to the case being that he kissed the bad guy and put him in jail. How far, and we've been talking about safety here, but how far can you go outside of safety for illegitimate reasons? The bad guy should be in jail. But it doesn't have anything to do with safety of the gun. The Safety and Gun Act, we know from the legislative history, from the various iterations of the act, that safety, supersafety, you know, just pulling it out of your hand, that kind of thing, that's one purpose of the act. Other purposes of the act are recognized by the Eastern Territory Court of Appeals and the Seattle decision, I believe, Sunday, January 1st, also published in the legislative history, are reducing firearm crime and also reducing gang gun violence. The accuracy of me is, I would pretend, is more focused on those elements of, you know, the purpose is that if a drug case is injected, it has to identify if it's warm-blooded and can be used to track down people. Let me talk about one other question that bothers me and ask this one individual who can't get a gun because he only has a left arm. He can't exercise the second amendment, right, if I understand the argument correctly, because of the statute. I think that that's his argument. For example, the record shows that he can take that gun and deliver it to the manufacturer and have it smushed out within the MNX's magazine release. So he is able to have a firearm and, in fact, he, along with, I believe it's Mann, I'm not sure who he is, that plaintiff admitted, along with all the other plaintiffs, that they currently possess a handgun that's suitable for self-defense and they separately admitted that they have the ability to buy some more handguns that are operable and suitable for self-defense. So I think that's the issue. But if, in fact, a person cannot get on the market, they have a gun which is not considered, which is not passed the test, because of some physical defect, the second amendment would still apply to them, correct? Yes. The second amendment is a lawsuit before, right, that's enjoyed by the state to be lawsuits. Except for felons, maybe, if there's some categories. Okay. Do you mean by the MNL? Yes. So it's a magazine disinfect mechanism. It's basically, it's a function that prevents a gun from firing when the magazine in the semi-automatic pistol is outside the firearm. So the idea is that the gun could otherwise be fired if it was pulled out of the chamber? If it didn't have that. If it didn't have the idea for it. And the idea that is that the legislative history shows us lots of firearms accidents occur when people think the gun is empty, but it is, in fact, loaded. People think that if you take the magazine out, the gun is unloaded, and, in fact, you're still allowed in the chamber. Yes, exactly. If the purpose of the second amendment is to allow people to defend themselves, why would you place that restriction on them? When the gun, even if they don't want the magazine in there for other reasons, because it's also useful when it's not loaded in the chamber. So it's how the gun can be used as well. That's an interesting question, and let me tell you why. Because that goes directly to what this lawsuit is about. The plaintiffs, regardless of some language that appears in the record, they're not challenging the efficacy of the magazine disconnect mechanism. They're not challenging the efficacy of the chamber load indicator. They're not challenging the absence of that micro. There's a separate case in California that's a state court case that talks about whether or not micro-stamping is, in fact, possible or impossible. Those kind of things. Their issue, the way that they have framed this case, is that you're not allowed to require these features on handguns, because if you can say that a firearm is in common use, you can't regulate it, basically. So that's why we do not, that's why there's not expert testimony in the record about whether or not exactly how MPMs work and whether they're the best way to prevent. We have a disagreement on that, but it's not subject to their claim at all. Because the MPM actually disables the gun. Well, so it disables the gun when the magazine is, when the gun is not fully contained, so to speak. And the idea for that, in addition to just, you know, it's already happened upon the guns, you know, not just the actual gun operator, but someone would find the gun, a child or somebody like that, and think that it's, you know, unloaded. But in fact, it's not loaded. And the chamber load indicator, just to confirm, your position continues to be that the consideration of the MPM is through step one. Is that correct? I suppose I could imagine. You're not defending, you're not defending the MDM under Haines Looney. You still want to defend the MDM, that there's no sense in the matter right at all. Is that correct? Those are two very different arguments. Right. So we think that the act in its entirety can be, can survive at step one. But to sort of answer that slightly differently, you're correct that there are various pieces of this legislation that are different and might be analyzed slightly differently. Microstamping was sort of the third iteration. MDM and CLI was sort of the second iteration. And the first were the draw safety and the fire safety and the safety mechanisms. Which, by the way, just for the team, so they'll probably have a chance to make the record clear on that. The second amendment complained in this case, which was the operative pleading. The relief, this is important, the relief we're praying for is an injunction in joining the entirety of the act, all its provisions, unsafe hanging of the act as a whole. So that's why we made it a point in our brief to note, okay, draw safety, fire safety, safety mechanisms, those are abandoned, those are off the table. That's not always the case based on the pleadings of this case. I see that I've got seven seconds left. Thank you, your honors. I ask you to confirm the district court's judgment in its entirety. Thank you, your honors. First of all, the reason the relief was framed that way is because we also have a challenge to the fact that hangers fall off the roster, even if they're determined to be not unsafe, for lack of a payment that nobody can produce. And that affects the whole roster. If we can't rewrite the law, all we can tell the legislature is to try again, because our costs will be fixed. What I'd like to address though, primarily, in this time I have remaining, is why we prevail, even under intermediate scrutiny. I suppose that this is a scrutiny level case, and of course, it is gravitating towards that end. And let's suppose even further, that even though this law substantially impacts people's ability to take handguns, use self-defense as a means, most handguns we would apply to intermediate rather than strict scrutiny. The problem the state has is the law is both under and over-inclusive. The fit, which is the judicial function here to determine the constitutionality of the fit, is simply absent. Let's talk about over-inclusiveness. Obviously, this is a law that works to ban most handgun models in America. And if the state wins here today, they could ban all of them, because for whatever reason, they're part of micro-stamping, semi-automatics, and the micro-stamping rationale allows the co-efficient of revolvers as well, because revolvers don't eject. What's your reaction to the CLI? The chamber loaded indicator, when this was passed, was pressed on to 11% of similar manufactured handgun models per response to the bill. So just by requiring CLI, you've banned 89% of all handguns. But that's easy to disorder, right? It's like putting airbags in cars. You make the argument that manufacturers don't want to do it, and that there won't be any cars built into us. We've managed to figure out that accommodation. It's actually not in the CLI requirement, I believe, for technical reasons. It doesn't apply to grip, fire, aviation, but also some guns, some people won't have a CLI because it won't be manufactured. Sometimes you can't sell the gun if it runs that feature. Supposedly, if you're designing a product, adding a particular feature makes that product undesirable. Imagine it's still functional, isn't it? You don't like it, do you? Whether we like it or not is beside the point. The fact is that, looking at arms of the kind in common use in America, 89% of them, that long ago, didn't have a CLI, so you've banned 89% of all handguns. That just gives you proof step one. We're not trying to scrutinize why you can't have it, because the drop safety mechanism may have been objected to by manufacturers as well. It would require them to reconfigure the gun or make it more expensive, and people might accept that. Final. Just to state the answer, Your Honor, is now the state's anti-safety manual teaches people not to rely on CLIs. I mean, it's a basic common sense safety measure. We treat all guns. Not to rely on it at all, or not to rely on it exclusively. Or to say that, always assume the gun is loaded. If you're always assuming the gun is loaded, then you're disavowing the CLI. Why is that? Because you're scared. Because if you're making the assumption that the gun is loaded because all guns are indicated as loaded, then the particular – I have an indicator in my car that tells me if I have it, but that should prevent us from saying in driver training, always check your seat belt even if the lights are on in your car. It's just common sense. But don't take reckless action. Don't treat the gun as if it were unloaded unless you've opened it, inspected it, make sure that it's actually loaded. Right. And a CLI might be a nice reminder to detect it. If you fail to detect it, you can go, holy Toledo, it looks like my CLI indicator is on. That's where people make bad assumptions, and the way we address bad assumptions is not to make any assumptions at all. Can I ask you, these three restrictions, in your view, do they rise and fall together, or is there some basis to look at them individually and that one or more of them might be acceptable but all of them not? It depends on the way the court decides the case. If you're looking at it as a smooth case, then perhaps you don't necessarily rise and fall together, and the court can treat them differently. What's difficult to know is the interaction between the various features. For example, there are guns that may have CLIs but not MDMs moving all the way around, and this keeps narrowing down to only those that have both, and then the micro-statement on top of it, and it's sort of hard to sometimes detangle that. But the rationale here, if we're looking at it, and it's probably a good issue, I realize I'm going to go from side to side, so I'll wrap up, is simply that this over-inclusive rule reaches far too many guns. It's under-inclusive in the sense that it has all the successors, all the special people who are allowed to introduce, and who are able to entertain unskippable handcuffs. Your Honor, with respect, I'm going to be able to ask the defendant for a reversal. Thank you. Thank you both for the briefing, incentive briefing, as well as your argument this morning. The case opinion versus Litley is submitted. And the last case for argument is Sierra Club versus Clutch. Thank you.
judges: Wallace, McKeown, Bybee